| | | |
|---|---|---|
| ROBERT CALANDRIELLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:08-1099 |
| | ) | Judge Echols |
| TENNESSEE PROCESSING | ) | |
| CENTER, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

In this employment discrimination action which was originally filed in the Davidson County Circuit Court and removed to this Court based upon diversity jurisdiction, Plaintiff Robert Calandriello sues his former employer Defendant Tennessee Processing Center, LLC ("TPC") for disability discrimination and emotional distress.  TPC has filed a Motion for Summary Judgment (Docket Entry No. 10), to which Plaintiff has responded in opposition (Docket Entry No. 17), and TPC has replied (Docket Entry No.  19).

## I.  FACTUAL BACKGROUND

TPC is a subsidiary of Technology Services Group, Inc. which, in turn, is a subsidiary of The Bank of New York ("BNY").  TPC is one of two data processing centers in the United States responsible for processing business data, such as stock and wire transfers, for the United States government.

The work performed at TPC is confidential and therefore the facility utilizes various security measures including a closed gate with guards, retina scans for employee access, x-rays for all mail

1

and packages, and Federal Bureau of Investigation background checks on all employees. The security measures utilized by TPC are reviewed by the Department of Homeland Security.

BNY hired Plaintiff on August 25, 1997 as a Data Center Acceptance Testing Technician. While Plaintiff initially worked in New York City, his job title, supervisor, and location changed several times throughout his employment.

Shortly after September 11, 2001, Plaintiff transferred to a facility in North Bergen, New Jersey and then to a facility in Teaneck, New Jersey. Sometime in 2004, BNY built a facility in Somerset, New Jersey and Plaintiff transferred there. On September 29, 2005, Plaintiff transferred to TPC, which is located in Nashville, Tennessee.

AT TPC, Plaintiff worked in the Data Center Change and Configuration Department, Business Application Change Management Unit. Alan Joseph ("Joseph"), who worked in the New Jersey office, was Plaintiff's direct supervisor. Dennis McGuire ("McGuire") had overall responsibility for the Business Application Change Management Unit, and Donald Enfinger ("Enfinger") was the General Manager and Managing Director for TPC.

Defendant claims that on September 12, 2007, Enfinger was told by one of Plaintiff's co-workers that Plaintiff had a poster in his cubicle which appeared to be inappropriate for the workplace.[1] That same co-worker also reportedly told Enfinger that he had observed Plaintiff on the Internet viewing assault weapons. The co-worker told Enfinger that Plaintiff's conduct did not scare him, but that he did not want to be identified to Plaintiff as the person who made the complaint.

---

[1]In its Statement of Undisputed Facts, Defendant identifies the co-worker as Casey Bailey ("Bailey"), a researcher at TPC. Plaintiff does not dispute that Enfinger somehow learned of the situation, but refuses to concede that Bailey complained because Defendant has not supplied Plaintiff with a working phone number for Bailey, and because an Affidavit has not been submitted by Bailey. In an Affidavit from TPC's counsel filed with its reply brief, counsel avers that Plaintiff's alleged inability to contact Bailey has never been brought to her attention.

2

Enfinger asserts it was his impression that the co-worker's tone and demeanor belied his assertion that he was unconcerned for his own safety because of Plaintiff's conduct.

Upon receiving the complaint, Enfinger did a walk-through of the area in which Plaintiff's cubicle was located and personally observed the poster in question. The poster was a photocopy of one of the company's "IMPACT"[2] posters which originally had the picture of a BNY employee under the text "Impact is Inspiration." Plaintiff reduced the size of the poster and substituted Charles Manson's face for that of the BNY employee. The altered poster was made using TPC's equipment.

When Enfinger approached the cubicle, Plaintiff asked Enfinger if he liked the parody. Enfinger told Plaintiff he did not think the poster was appropriate for the workplace and asked Plaintiff to take the poster down. Plaintiff complied with that request.[3]

Prior to the complaint about Plaintiff's posting of the Charles Manson poster, Enfinger had sent an email to all employees (including Plaintiff) about an expected visit and tour on September 12-13, 2007, by members of the Tennessee Governor's Information Technology Counsel. In anticipation of the visit, Enfinger requested that each employee clean his or her respective area, make trips through the Data Center looking for items to clean or straighten, and be on heightened alert. Enfinger's September 12, 2007 walk-through occurred before the tour and thus the poster was not on display at the time of the tour.

---

[2]TPC used the "IMPACT" posters, which focused on themes such as diversity and vision, to boost morale among employees.

[3]In his deposition, Plaintiff testified he believed the poster was a "good parody that impact is inspiration for the fact that Charles Manson never murdered anyone." He also testified that he knew management would consider the poster inappropriate and would ask him to take it down. (Plaintiff Depo. at 30-33).

Enfinger reported both the poster incident and Plaintiff's alleged improper use of the Internet to Lauren Levine ("Levine"), the Human Resources Manager for BNY. TPC decided to issue Plaintiff a Final Warning for the poster incident, and Levine, along with Chip Smith, the Director of Global Security, and Jeff Northcutt, Assistant Vice President Systems and Technology, began an investigation into Plaintiff's Internet usage.

On September 27, 2007, McGuire (who was acting as TPC's Managing Director in Enfinger's absence) delivered to Plaintiff a Final Warning for creating and displaying the Charles Manson poster in his work area. The Final Warning, which was signed by Levine and by McGuire (on behalf of Enfinger), warned Plaintiff that "[a]ny future displays of this nature including printed, on computer monitor, etc. could include further discipline, including and up to termination." (Enfinger Depo. Ex. 2).

When he received the Final Warning, Plaintiff signed the same and acknowledged that he had used poor judgment in creating and publicly displaying the poster in his work area. A copy of the Final Warning was placed in Plaintiff's personnel file.

On October 1, 2007, Plaintiff orally told McGuire, for the first time, that he had a bi-polar mental disorder which he believed caused a lapse in judgment which resulted in his inappropriately creating and displaying the Charles Manson poster in his work area. Plaintiff also opined that because his conduct did not directly threaten any employee, did not involve destruction of company property or result in any financial loss to the company, he should be exempt from any disciplinary action because he was entitled to a reasonable accommodation under the Americans With Disabilities Act ("ADA"). McGuire told Plaintiff he would contact Human Resources about the requested accommodation and someone would be back in touch with Plaintiff. Plaintiff made a similar request for a reasonable accommodation to Enfinger by sending him an e-mail asking that the Final Warning

4

be removed from his personnel file. He attached to the e-mail an excerpt from the Equal Employment Opportunity Commission's ("EEOC's") website dealing with discipline of employees with a disability. Enfinger informed Plaintiff that he had sent his request to TCP's legal counsel for review.

During this same period, TCP's investigation into Plaintiff's Internet usage revealed that from August 12, 2007 until September 17, 2007, Plaintiff used his computer at TCP frequently to view websites which contained violent images, images of assault weaponry, and serial killers. In its Statement of Facts, TPC claims it used an Internet and data security tool called Websense which allowed the company to filter and categorize URLs[4] by risk. According to Defendant, a review of Plaintiff's computer indicated that during the three-week period in question, Plaintiff's computer included 10,515 hits classified as shopping, 284 hits classified as military, 35 hits classified as adult material, 21 hits classified as weapons, 13 hits classified as games, and 1 hit each in the militancy extremist and racism/hate categories. In response, Plaintiff refuses to admit those alleged facts because he claims he did not receive the Websense report. In an Affidavit filed with TPC's reply in support of its Motion for Summary Judgment, counsel for Defendant insists that Plaintiff was in fact provided with a CD containing the Websense report during discovery. Regardless, Plaintiff admitted in his deposition that he often surfed the web and that he looked at pictures and/or articles about assault weapons and serial killers on his work computer.

---

[4]"URL" stands for "uniform resource locator" and is essentially the address of a web page on the worldwide web.

TPC was particularly concerned because Plaintiff's computer contained pictures of a rifle that appeared to be taken at someone's home[5] and some pictures were of an assault weapon with a silencer and bayonet. TPC asserts that Plaintiff's usage was in violation of company policy. Specifically, section II.G.030 of BNY's Policy Directory provides in pertinent part as follows:

• Conduct on the Internet shall be in compliance with the Code of Conduct, and all existing Company policies apply to employee, vendor, and service provider activities on the Internet . . .
• Internet connections are intended for activities that support Company business or professional development of employees. "Web surfing" is restricted to these uses.
• Under no circumstances may users connect to external systems (e.g., web sites) that are known to contain or are suspected of containing objectionable matter, including but not limited to, profane or otherwise inflammatory material, pornographic or other sexually explicit material of any kind, computer viruses, or similar inappropriate material.

(Docket Entry No. 12-2 at 43).

Plaintiff admits that he viewed military sites and sites which covered the wars in Afghanistan and Iraq, as well as news sites which provided news about serial killers, on his work computer. Plaintiff asserts that his use of the Internet was not in violation of company policy because he "was told by my supervisor to surf the internet when I had no project to work on" and "[f]ellow employees were constantly surfing the internet going to various sites." (Pf. Aff. ¶¶ 9-10). Plaintiff also claims that pictures of guns were not uncommon on computers at TCP and that guns were a constant conversation topic. (Id. ¶ 11).

Smith, TPC's Director of Global Security, was concerned about the discovery of the nature and extent of Plaintiff's unauthorized use of the company's computer. He believed that Plaintiff's continued employment posed a high risk, particularly in light of the recent increases in workplace

_____

[5]In his deposition, Plaintiff admitted that these pictures were of his rifle and that the pictures were taken in his home.

6

violence being reported in the news media. After consultation between Corporate Security, Human Resources, and Legal Counsel, TPC decided that because of the items found on Plaintiff's computer, as well as his display of the Charles Manson poster in his work area, Plaintiff's employment should be terminated immediately due to "loss of confidence." Defendant claims that Plaintiff's bipolar disorder was not discussed or otherwise considered in the termination decision.

Enfinger and McGuire (who both agreed with the termination decision) were tasked with informing Plaintiff that his employment at TPC was being terminated due to "a loss of confidence" which arose as a result of Plaintiff's posting of the Charles Manson poster in his work stattion and his improper use of his computer. Plaintiff was provided with a number to dial into a conference call between himself, Enfinger and McGuire. During that conference call on October 16, 2007, Plaintiff was told that he was being terminated effective November 1, 2007, and that he was not to return to the workplace. On October 17, 2007, the Company, through its Human Resource Manager, Evelyn Miller, sent Plaintiff an overnight letter which confirmed the termination decision.

After Plaintiff's discharge on November 1, 2007, security measures at TPC were increased, and included placing an armed guard at the closed gate. Further, because of personal security concerns due to their role in Plaintiff's termination, Enfinger and McGuire received personal protection at their homes for approximately four (4) weeks.

Plaintiff alleges that his bipolar mental disorder affects him in numerous ways. The disorder manifests itself in phases of mania and depression. Those phases are episodic and vary between three days to four months.

When he is in a manic phase, Plaintiff has difficulty interacting with people. His thoughts race, and he has difficulty concentrating and making decisions. He also becomes agitated and makes impulsive comments. During such phases, Plaintiff has difficulty sleeping and sometimes goes five

7

to seven days with little or no sleep, even with the aid of medication. When he is in a depressive state, Plaintiff claims that without medication he cannot get out of bed for periods of up to ten days and that he lacks the ability to properly care for himself. Plaintiff also claims that the medication he takes for his condition renders him unable to engage in sexual activity, impairs his ability to communicate and express emotions, and slows his thinking. The medication also makes Plaintiff sleepy.

As a result of his termination, Plaintiff filed suit in state court claiming that TPC should have accommodated his disability (bipolar disorder) by removing the Final Warning from his personnel file and that his termination was in retaliation for his requesting an accommodation. Plaintiff's disability discrimination claims are brought under the Tennessee Disability Act ("TDA"), TCA § 8-50-103 and the Tennessee Human Rights Act ("THRA"), §§ 4-21-101 *et seq.* He also brings a common-law claim for "intentional or negligent infliction of emotional distress/outrageous conduct."

## II.  STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does

8

not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The

nonmoving party's burden of providing specific facts demonstrating that there remains a genuine

issue of material fact for trial is triggered once the moving party shows an absence of evidence to

support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson,

477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence

in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

As indicated, Plaintiff alleges in his Complaint that Defendant violated the TDA and THRA

by failing to accede to his request for an accommodation and terminated him in retaliation for making

such a request. Plaintiff also alleges that this same conduct constitutes the negligent and/or

intentional infliction of emotional distress because it amounts to "outrageous conduct."

### A. DISABILITY DISCRIMINATION CLAIM

The TDA prohibits workplace discrimination based on an employee's disability. The statute

works in conjunction with the THRA to provide a civil cause of action for discrimination based upon

a handicap or disability. See, Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn.

2000). Because the TDA is similar to the ADA courts may look to cases interpreting the ADA for

guidance when presented with claims under the TDA and THRA. Id.

While Defendant recognizes the similarity between the TDA and the ADA, it claims that

there is one critical distinction between the statutes and that distinction is dispositive of Plaintiff's

discrimination claim. Defendant asserts that Plaintiff's claim hinges on the alleged failure to

9

accommodate but that the TDA, unlike the ADA, does not impose a duty of reasonable accommodation on an employer.

This Court has had several occasions to consider whether the TDA requires an employer to provide a reasonable accommodation. In Davis v. Ford Motor Credit Co., 2005 WL 2452601 (M.D. Tenn. 2005), the Court wrote:

> As indicated, the THA[6] is similar to the ADA. However, unlike the ADA which defines an individual with a disability as one "who, with or without reasonable accommodation can perform the essential functions" of the job, 42 U.S.C. § 1211(8), the THRA and THA contain no such language with respect to disabled individuals. This has led some courts to conclude that the THA does not require employers to provide disabled workers with a reasonable accommodation, meaning that if it is determined that an accommodation is required in order for the employee to perform the functions of his or her job, the inquiry is closed under Tennessee law. See, Workman v. Frito-Lay, Inc., 165 F.3d 460, 468 n. 9 (6th Cir. 1999); Pruett v. Wal-Mart Stores, Inc., 1997 WL 729260 at *13 (Tenn. Ct. App. Nov.25, 1998).
>     Even though the THA on its face contains no language requiring an employer to reasonably accommodate the disabilities of an employee, the Tennessee Supreme Court in Barnes, supra, held that the appropriate framework for analyzing a handicap discrimination claim under the THA and the THRA is as follows. First, a claimant must establish that he or she is a qualified individual with a disability. Next, the claimant must show that he or she can perform the essential functions of the job with or without reasonable accommodation. Finally, the claimant must show that he or she was subjected to an adverse employment action on the basis of a protected disability. Id. 48 S.W.3d at 709-10 (italics added). While [Defendant] labels such language mere "dicta" and "not controlling precedent," (Docket Entry No. 9 at 11), since diversity jurisdiction is invoked, this Court must follow the decisional law of the Tennessee Supreme Court. See Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)(law of state controls in diversity action "[a]nd whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern").

Id. at **7-8.

As in Davis, the Court will assume an employer must attempt to provide a reasonable accommodation under Tennessee law. Nevertheless, Plaintiff's TDA and THRA claim fails because

---

[6]In 2008, the Tennessee legislature changed the name of the statute from the Tennessee Handicap Act to the Tennessee Disability Act. T.C.A. § 8-50-103.

10

the accommodation he requested, i.e. that the Final Warning be removed from his employment record, is not one which TPC was required to make. Numerous courts have held that an employer may impose discipline for workplace violations on an individual with a disability and that a reasonable accommodation does not include foregoing or rescinding such discipline. See, Davilla v. Qwest Corp., 113 Fed. Appx. 849, 854 (10th Cir. 2004)("As the EEOC's Enforcement Guidance succinctly states, "[s]ince reasonable accommodation is always prospective, an employer is not required to excuse past misconduct even if it is the result of the individual's disability"); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)("Although contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace"); Canales-Jacobs v. New York State Office of Court Admin., 2009 WL 2431860 at *14 (S.D.N.Y. 2009) (request that an employer excuse misconduct "is unreasonable as a matter of law, because on-the-job misconduct . . . always constitute legitimate and nondiscriminatory reasons for terminating employment, even where the misconduct is caused by an undivulged psychiatric condition"); EEOC v. United Air Lines, Inc., 2000 WL 173846 at *12 (N.D. Ill. 2000)("The ADA requires an employer to make a reasonable accommodation, it does not require an employer to give an employee a 'second chance'").

In his response to Defendant's Motion for Summary Judgment, Plaintiff does not address TPC's argument that the TDA does not require a reasonable accommodation, or its argument that revoking discipline which has been imposed is not required as an accommodation for an alleged disability. Instead, and contrary to the allegations in his Complaint, Plaintiff asserts that he has stated a disparate treatment (as opposed to retaliation) claim under the TDA and argues that he was an otherwise qualified individual with a disability who was terminated because of that disability.

11

In order to establish a disability discrimination case, Plaintiff must show that he was "disabled" and the employer had reason to know of the disability; he was otherwise qualified to perform the essential functions of his job; and he suffered an adverse employment action. See, Nance v. Goodyear Tire & Rubber Co., 527 F.3d 539, 2008 WL 2151626 at *10 (6th Cir. 2008). "Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." Id. "If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." Id.

In this case, Defendant asserts that Plaintiff has failed to set forth sufficient evidence regarding the "disabled" element of a *prima facie* case. Defendant also argues that it has proffered a legitimate non-discriminatory reason for its actions which Plaintiff has failed to show to be pretextual.

Defendant advances somewhat appealing arguments with respect to its contention that Plaintiff cannot show that he was disabled or regarded as disabled within the meaning of the TDA. Those arguments ultimately fail, however, in light of the standards governing summary judgment and the fact that the burden of establishing a *prima facie* case of disability discrimination is not onerous and requires minimal proof. See, Bryson v. Regis Corp., 498 F.3d 561, 571 (6th Cir. 2008).

The term "disability" means a physical or mental impairment that substantially limits one or more of the major life activities of the individual. Bennett v. Nissan North Amer., Inc., 2009 WL 837726 at *7 (Tenn. Ct. App. 2009)(citing, 42 U.S.C. § 12102(2)(A)). Major life activities are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." Id. at *9 (citing, 29 C.F.R. § 1630.2(I)). One can fall within the protection of the TDA by showing either that he is disabled, that he has a record of disability, or that

12

he was regarded as disabled by his employer.  Id. at 10; see, Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1997).

In this case, a factual question exists as to whether Plaintiff is disabled within the meaning of the TDA.  Bipolar disorder is a mental impairment, see, Hill v. Metropolitan Gov't. of Nashville, 54 Fed. Appx. 199, 200 (6th Cir. 2002) and Plaintiff has set forth evidence from which a jury could conclude that this disorder substantially affected his major life activities of thinking, concentrating, and/or sleeping.  See, Verhoff v. Times Warner Cable, Inc., 299 Fed. Appx. 488, 493-94 (6th Cir. 2008)(assuming for purposes of opinion that "thinking" and "concentrating" are major life activities and that in light of the ADA Amendment Act of 2008, "thinking," "concentrating" and "sleeping" are major life activities under the ADA).  While Defendant has presented evidence which suggests that Plaintiff got along well with his fellow employees, Plaintiff has submitted an Affidavit in which he claims that his ability to sleep is severely hampered when he is in a manic phase and it is also during such a phase that he has difficulty communicating, thinking, concentrating, and getting along with others.  This Court simply cannot conclude as a matter of law that Plaintiff's bipolar disorder is not a disability within the meaning of the TDA.

The Court therefore turns to Defendant's stated reason for the termination.  Defendant claims Plaintiff was fired because TPC was concerned about the possibility of workplace violence after Plaintiff posted the Charlie Manson poster in his cubicle and pictures and/or articles about assault weapons and serial killers were found on Plaintiff's workplace computer.   Taking action because of fear of potential violence is a legitimate non-discriminatory reason for an adverse employment action. See, Allmond v. Akal Sec., Inc., 588 F.3d 1312, 1317 n.7 (11th Cir. 2009)(citation omitted)("neither the ADA nor the Rehabilitation Act requires employers to forgo a qualification

13

standard 'until a perceived threat becomes real or questionable behavior results in injuries'"). As one court explained:

> . . . But if an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the Americans with Disabilities Act. . . . The Act does not require an employer to retain a potentially violent employee. Such a requirement would place the employer on a razor's edge-in jeopardy of violating the Act if it fired such an employee, yet in jeopardy of being deemed negligent if it retained him and he hurt someone.

Palmer v. Circuit Court of Cook County, Ill., 117 F.3d 351, 352 (7th Cir. 1997)(internal citations omitted).

Because Defendant articulates a legitimate non-discriminatory reason for its action, the burden of production shifts to Plaintiff to show that the stated reason was a pretext. To establish pretext, Plaintiff must show that Defendant's proffered reason either (1) had no basis in fact, (2) did not actually motivate the adverse action, or (3) the reason was insufficient to motivate the adverse action. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 143 (2000); Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994).

Plaintiff has not shown that Defendant's proffered reason for his termination has no basis in fact. It is undisputed that Plaintiff created and displayed the Charles Manson poster, and it is also undisputed that Plaintiff surfed the Internet on his work computer and viewed non-work related websites which contained images of guns, rifles and serial killers. That leaves Plaintiff with showing either that the stated reason did not actually motivate the termination decision or that it was insufficient to support that decision.

In his response brief, Plaintiff does not directly address pretext, but instead focuses on the *prima facie* case. Nevertheless, it appears to be Plaintiff's position that pretext can be found because

14

members of management allegedly made derogatory comments about Plaintiff's mental state, co-workers also posted "humorous" posters, and Plaintiff was given permission to search the Internet.

As evidence in support of his allegations, Plaintiff directs the Court's attention to Plaintiff's Affidavit, as well as the "Kruse Affidavit," the "Garner Affidavit" and the "Riley Affidavit." (Docket Entry No. 17 at 6). However, the record contains no Affidavits from Garner or Riley.

In the Kruse Affidavit, Jim Kruse states that he was formerly a site supervisor of security at TPC and that during his tours around the facility he "saw at least one computer with military weaponry on it," "saw cubicles with humorous posters and pictures hung up – often making fun of corporate culture," and "often heard employees talking about guns and talking hunting." (Kruse Aff. ¶¶ 7-8). Kruse also states that "it was well known amongst employees, and management that Robert had a mental illness" and that he "heard members of the bank's management discuss Robert by saying things like 'watch out for Robert, he is crazy.'" (Id. at ¶¶ 9-10).

In his Affidavit, Plaintiff states:

> 7. While working at the Tennessee Processing Center I noticed that there was an effort to get rid of people who suffered from medical conditions. For example, Aya Zavigne was terminated after she suffered a psychiatric illness, and Dave Horton was terminated after he suffered a stroke.
> 8. The Code of Conduct was selectively enforced constantly. For example, complaints of harassment, hostile work environment, a request for reasonable accommodation, were all ignored or not provided for as specified in the Code of Conduct.
> 9. I was told by my supervisor to surf the internet when I had no project to work on.
> 10. Fellow employees were constantly surfing the internet, going to various sites.
> 11. Pictures of guns were and the subject of guns were a constant topic of conversation. Even certain members of management talked about guns and looked at websites featuring guns.

(Pf. Aff. ¶¶ 7-11).

15

"[A] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false *and* that discrimination was the real reason." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993)(emphasis in original). Thus, to survive summary judgment, Plaintiff must offer evidence which "call[s] into question the veracity of" the employer's explanation. Rufo v. Dave & Busters, Inc., 2007 WL 247891 at *4 (6th Cir. 2008). An employee's own speculation, unsupported by fact, is not enough to establish pretext. Upshaw v. Ford Motor Corp., 576 F.3d 576, 587 (6th Cir. 2009). Nor is "mere conjecture that the employer's explanation is a pretext for discrimination a basis for denying summary judgment." Id.

Where, as here, Plaintiff seeks to show pretext on the ground that the proffered reason did not actually motivate, or was insufficient to motivate, the adverse action, Plaintiff may offer "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." Russell v. Univ. of Toledo, 537 F.3d 596, 607 (6th Cir. 2008). The determination of whether one is "similarly situated" generally entails a comparison with co-workers who dealt with the same supervisor, were subject to the same standards, and who engaged in like conduct. Id.

Kruse's statement that some employees posted "humorous" pictures in their cubicles which sometimes parodied corporate culture provides nothing from which the Court or a jury could make a reasonable comparison with a poster suggesting Charles Manson provided inspiration. Kruse's and Plaintiff's statements that some employees talked about guns and hunting says nothing about whether those same employees visited the number and types of websites that Plaintiff visited, or whether those employees posted pictures similar to that posted by Plaintiff. It also says nothing about whether management forewent punishment if, and when, it discovered that an employee was

16

flaunting the rule against utilizing company computers for personal use.  See, <u>McDermott v. Continental Airlines, Inc.</u>, 2009 WL 2336969 at *6 (6th Cir. 2009)(a plaintiff must point to similarly situated employees receiving different treatment in order to show pretext); <u>Smith v. Leggett Wire Co.</u>, 220 F.3d 752, 762 (6th Cir. 2000)(comparison to co-workers "inapt" where the co-workers were disciplined by a different decisionmaker and engaged in different conduct).

Plaintiff's statement in his Affidavit that some unnamed supervisor[7] at some unspecified time gave him permission to surf the web is insufficient to show pretext.  Such a blanket assertion does not indicate that the supervisor knew of the sites Plaintiff was visiting, or suggest that the decisionmakers in this case had knowledge of that alleged permission.

Plaintiff's reference to employees Aya Zavigne ("Zavigne") and David Horton ("Horton") is of no evidentiary value because Plaintiff admitted in his deposition that the only thing he knew about the reason for Zavigne's termination was "what I suspect," and that he could "only guess" but thought that Horton's slight stroke "may have had something to do with" Horton's termination.  (Pf. Depo. at 82-84).  Further, Plaintiff does not indicate who the ultimate decisionmakers were in relation to Zavigne's and Horton's terminations.

Finally, Kruse's vague assertion that "management" knew about Plaintiff's mental illness and stated "watch out for Robert, he is crazy" is insufficient to show pretext.  Even assuming members of management knew of Plaintiff's bipolar disorder, this does not mean that management knew Plaintiff was disabled for purposes of the TDA, or that action was taken because of that illness.  See, <u>Toyota Motor Mfg. v. Williams</u>, 534 U.S. 184, 198 (2002)(mere fact that an individual has a medical diagnosis of an impairment does not mean they are disabled under the ADA).  Moreover, there is no

---

[7]In his deposition, Plaintiff claimed that Joseph, his supervisor based in New Jersey, told him that when he was not busy he should "stay out of trouble" and surf the Internet.

17

indication as to who or when someone in management referred to Plaintiff as being "crazy" and it is incumbent upon Plaintiff to establish that the decisionmaker harbored bias. See, Norbuta v. Loctite Corp., 1 Fed. Appx. 305, 316 (6th Cir. 2001)(citation omitted)("Factors affecting a statement's probative value include the nexus between the discriminatory remarks and the challenged action, 'the declarant's position in the corporate hierarchy, the purpose and content of the statement, . . . the temporal connection between the statement and the challenged employment action,' and whether the statement buttresses other evidence of pretext").

When an employer sets forth a non-discriminatory reason for its action, the failure to produce evidence of pretext is fatal to a discrimination claim. See, Alexander v. CareSource, 576 F.3d 551, 565 (6th Cir. 2009).    Because Plaintiff has not called Defendant's articulated reason for his termination into question through any probative evidence which would suggest a discriminatory intent, summary judgment will be granted to Defendant on Plaintiff's TDA and THRA claims.

**B.  Emotional Distress Claim**

In his Complaint, Plaintiff brings a claim for "intentional and negligent infliction of emotional distress/outrageous conduct." Defendant has moved for summary judgment on that claim.

Plaintiff has not responded to Defendant's argument and therefore the Court could view the claim as abandoned and grant summary judgment because a party has an obligation to establish his or her claim. See, Dubose v. City of Morristown, 2009 WL 1766008 at *4 (E.D. Tenn. 2009). Regardless, Plaintiff has failed to present a jury question on his emotional distress claim.

In Tennessee, "[o]utrageous conduct and intentional infliction of emotional distress are different names for the same cause of action" and hence "the two names are used interchangeably." Nairon v. Holland, 2007 WL 626953 at *4, n. 1 (Tenn. Ct. App. 2007).  The tort of outrageous conduct in Tennessee exists only where (1) the conduct of the defendant has been so outrageous in

18

character, and so extreme in degree, as to be beyond the pale of decency, and to be regarded as atrocious and utterly intolerable in a civilized society, and (2) the conduct results in serious mental injury.  Swallows v. Western Elec. Co.,  543  S.W.2d 581, 582-83 (Tenn. Ct. App. 1976). "Generally, 'the case involves facts which would arouse the resentment of an average member of the community and lead him to exclaim, "Outrageous!"  Sayer v. Memphis Educ. Ass'n, 2006 WL 3298326 at *6 (Tenn. Ct. App. 2006)(quoting, Chandler v. Prudential Ins. Co., 715 S.W.2d 615, 622 (Tenn. Ct. App. 1986)).  Hence, alleging that a defendant "has acted with an intent which is tortious or even criminal, or that he had intended to inflict emotional distress" is insufficient to support an outrageous conduct claim.  Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997).

Cases finding outrageous conduct involve conduct which is much more egregious than that which occurred here.  See, Johnson v. Woman's Hospital, 527 S.W.2d 133 (Tenn. Ct. App. 1975)(mother being shown her deceased baby preserved in formaldehyde in a jar); Dunbar v. Strimas, 632 S.W.2d 558 (Tenn. Ct. App. 1981)(mother being erroneously informed her daughter's death was the result of sexual assault and suffocation).  The facts alleged by Plaintiff do not rise to this level or constitute such extreme, outrageous conduct which would be beyond the pale of decency.  The facts presented by Plaintiff, if true, are not atypical of the fact pattern presented in many discrimination cases and "discriminatory conduct does not automatically give rise to the imposition of liability for the intentional infliction of emotional distress."  Arnett v. Domino's Pizza I, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003).

Further, while Plaintiff alleges in his Complaint that "[a]s a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered extreme emotional distress" (Complaint ¶ 25), he points to no evidence in the record which would support a claim of serious mental injury.  This is fatal not only to an intentional infliction of emotional distress claim, see, Swallows, 543 S.W.2d

19

at 583, but also a negligent infliction of emotional distress claim, see, <u>Eskin v. Bartee</u>, 262 S.W.3d 727, 737 (Tenn. 2008); <u>Camper v. Minor</u>, 915 S.W.2d 437, 446 (Tenn. 1996). Accordingly, summary judgment will be granted with respect to Plaintiff's negligent and intentional infliction of emotional distress/outrageous conduct claim.

## IV. <u>CONCLUSION</u>

On the basis of the foregoing, Defendant's Motion for Summary Judgment (Docket Entry No. 10) will be granted and Plaintiff's claims against Defendant will be dismissed.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE